IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Freda Lydia, | ) | C/A No.: 1:15-795-MBS-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On September 20, 2005, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on May 1, 2005. Tr. at 69, 70, 94–99, 100–06.

Her applications were denied initially and upon reconsideration. Tr. at 73–77, 81–82, 84–85. On January 22, 2009, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Gregory M. Wilson. Tr. at 30–68 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 12, 2009, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 6–22. On April 15, 2011, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–5. Plaintiff subsequently filed a complaint in this court on June 14, 2011. Tr. at 590–91. On August 13, 2012, the Honorable Patrick Michael Duffy, U.S. District Judge, issued an order reversing and remanding the case to the agency and adopting the Magistrate Judge's Report and Recommendation finding that the ALJ failed to explain his reasons for concluding that Dr. Ruffing's opinion was inconsistent with his findings. Tr. at 592–93, 594–610. The Appeals Council remanded the case to the ALJ on May 21, 2013. Tr. at 611–13. A second hearing was held before the ALJ on November 21, 2013, and a third hearing was held on July 10, 2014. Tr. at 457–514, 515–65. The ALJ issued an unfavorable decision on December 5, 2014, which became the final decision of the Commissioner for purposes of judicial review. Tr. at 391–456. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on February 24, 2015. [ECF No. 1].

      B.     Plaintiff's Background and Medical History

          1.     Background

Plaintiff was 37 years old on her alleged disability onset date and was 47 years old at the time of the most recent ALJ decision. Tr. at 448. She completed high school. Tr. at

35, 136. Her past relevant work ("PRW") was as a winder, a spinner, a creeler, a cashier, and a stock clerk. Tr. at 59. She alleges she has been unable to work since May 1, 2005. Tr. at 94.

### 2.    Medical History

Plaintiff presented to Walter Grady, DO ("Dr. Grady"), on January 6, 2004, complaining of injuries to her left wrist and right knee that were sustained when she tripped over a pole at work. Tr. at 202. Dr. Grady observed tenderness and bruising in Plaintiff's left wrist and hand. *Id.* He indicated an x-ray of Plaintiff's left wrist showed a non-displaced scaphoid waist fracture. *Id.* His examination of Plaintiff's right knee revealed abrasions and tenderness. *Id.* Dr. Grady placed Plaintiff in a long arm spica cast and referred her for magnetic resonance imaging ("MRI") of her right knee. Tr. at 203. He restricted Plaintiff to sedentary work to be performed with her right hand only. *Id.* Plaintiff continued to report right knee and left wrist pain during a follow up visit on January 20, 2004. Tr. at 201. Dr. Grady indicated Plaintiff's left wrist was healing and that the MRI of her right knee was negative. *Id.* On February 5, 2004, Dr. Grady observed tenderness and decreased range of motion ("ROM") in Plaintiff's left wrist. Tr. at 200. He restricted Plaintiff to work that required no use of her left hand and wrist. *Id.* A February 11, 2004, MRI of Plaintiff's left wrist indicated edema or contusion in the greater multangular with surrounding soft tissue edema; joint effusion in the proximal compartment and radiocarpal joint; and poor visualization of the scapholunate ligament that was of uncertain significance. Tr. at 186–87. On February 19, 2004, Dr. Grady recommended Plaintiff undergo injection therapy to her left wrist, but Plaintiff declined

3

the treatment. Tr. at 199. Dr. Grady indicated Plaintiff should continue with physical therapy and follow up in three weeks. *Id.* On March 26, 2004, Dr. Grady observed that Plaintiff continued to be tender in the scapholunate ligament juncture and the region of the scaphoid tubercle. Tr. at 198. He recommended Plaintiff undergo diagnostic and surgical arthroscopy of her left wrist. *Id.*

On June 7, 2004, Plaintiff reported pain in her bilateral wrists that was worse on the right than on the left. Tr. at 197. She indicated she had developed a mass on her right wrist, and Dr. Grady observed her to have a freely-moveable cystic mass in the dorsum. *Id.*

On June 29, 2004, Dr. Grady noted that arthroscopic surgery revealed a scapholunate ligament tear in Plaintiff's left wrist and extensive digitorium brevis manus brevis muscle anomaly. Tr. at 196. He recommended Plaintiff participate in a resistance program to strengthen her left wrist and upper extremity before considering further surgery. *Id.* Plaintiff reported increased left wrist pain in a follow up visit with Dr. Grady on July 27, 2004. Tr. at 195. Dr. Grady noted decreased grip strength and reduced ROM in Plaintiff's left hand and recommended she undergo scaphocapitate arthrodesis surgery. *Id.* During a pre-operative visit on September 20, 2004, Plaintiff indicated that she was experiencing significant depression as a result of a marital separation and that she had recently lost 20 pounds. Tr. at 193. She stated she was unable to afford treatment for her depression and requested that her surgery be delayed until she could "get herself together mentally." *Id.* Dr. Grady indicated he would hold off on surgery to allow Plaintiff time to obtain medical treatment for her depression and stated he would phone Cherokee County

Mental Health to request that Plaintiff be worked in for treatment. *Id.* He restricted Plaintiff to light duty work with splints on her bilateral wrists and a lifting restriction of five pounds. *Id.* On December 6, 2004, Plaintiff complained to Dr. Grady of bilateral wrist pain. Tr. at 190. Dr. Grady observed several abnormalities and ordered that Plaintiff be scheduled for left wrist surgery, be placed in a right thumb spica splint, undergo x-rays of her right wrist, and possibly undergo an MRI of her right wrist. Tr. at 190–91. On January 11, 2005, Plaintiff informed Dr. Grady that she had elected not to undergo surgery, and Dr. Grady cancelled the surgery. Tr. at 189.

Dr. Grady provided an undated physician's statement indicating Plaintiff could work part-time, but should not fatigue her left wrist or use it to lift over three pounds. Tr. at 130. He diagnosed a scapholunate tear to Plaintiff's left wrist and chronic left wrist pain secondary to Dequervain's stenosing tenosynovitis. *Id.*

On February 7, 2005, Plaintiff presented to Spartanburg Area Mental Health Center ("SAMHC") complaining of depression and marital problems. Tr. at 208. She reported psychiatric symptoms that included suicidal ideation, agitation/irritability, inappropriate affect, changes in sleep and appetite patterns with a 30-pound weight loss, anxiety/panic attacks, depressed mood, tearfulness, low energy/fatigue, and hopelessness. *Id.* She was diagnosed with severe major depressive disorder. Tr. at 208–09.

On February 9, 2005, Preston Edwards, M.D. ("Dr. Edwards"), indicated Plaintiff had severe depression and would be following up with the mental health clinic on February 28. Tr. at 318. He prescribed a 15-day supply of Paxil to treat Plaintiff's depression until she could be seen by the psychiatrist. *Id.*

5

Plaintiff followed up at SAMHC on February 14, 2005, and reported improved affect after beginning Paxil. Tr. at 210. She indicated her sleep and appetite had improved. *Id.* The clinician indicated Plaintiff was brighter, more verbal and spontaneous, and exhibited more hopefulness and optimism, but that she was also tearful at times. *Id.*

Plaintiff presented to Husam Mourtada, M.D. ("Dr. Mourtada"), on November 21, 2005, for a consultative examination. Tr. at 217–20. Plaintiff complained to Dr. Mourtada of bilateral wrist pain that radiated from her wrists to her shoulders. Tr. at 217. She also reported low back pain and occasional bilateral thigh numbness as a result of being hit and kicked in her low back by her ex-husband. *Id.* Dr. Mourtada noted that Plaintiff was crying because of her pain. *Id.* Plaintiff endorsed symptoms of depression that included decreased appetite and poor sleep. *Id.* Dr. Mourtada indicated Plaintiff had 5-/5 motor strength in her upper and lower extremities; 1+/4 deep tendon reflexes in her bilateral biceps, triceps, and brachioradialis; 2+ deep tendon reflexes in her bilateral knees and ankles; impaired sensory reflexes in her bilateral thighs and upper extremities; negative straight-leg raising test; and no focal deficits in her cranial nerves. Tr. at 219. He assessed Plaintiff's gait as normal, but discovered tenderness to palpation of Plaintiff's shoulders, cervical musculature, sacrum, spinous processes, sacroiliac ("SI") joints, and paraspinous muscles. *Id.* Plaintiff was able to flex her lumbar spine to 75 degrees and extend it to 25 degrees. *Id.* Dr. Mourtada assessed chronic bilateral wrist pain secondary to injury, mechanical low back pain, and depression. *Id.* He recommended that Plaintiff's depression be treated by her primary care physician or a psychiatrist. *Id.* He stated

Plaintiff should be able to manage her own funds independently. Tr. at 220. Plaintiff demonstrated painful ROM of her wrists. *Id.* An x-ray of her lumbar spine revealed mild hypertrophic degenerative changes. Tr. at 216. An x-ray of her left wrist indicated mild degenerative changes at the distal radial ulnar joint. *Id.*

Plaintiff returned to Dr. Mourtada on December 15, 2005, for a full examination of her upper extremities. Tr. at 221. Dr. Mourtada indicated Plaintiff was unable to perform fine and gross manipulations without difficulty secondary to increased pain in her wrist. *Id.* He stated Plaintiff could lift five pounds. *Id.* He indicated Plaintiff's left wrist ROM was limited to 60 degrees of flexion and 38 degrees of extension. *Id.* He assessed Plaintiff's grip strength as 4-/5 on the left and 5-/5 on the right. *Id.* Dr. Mourtada indicated the ROM assessment was an objective finding, but that his other opinions were based upon Plaintiff's subjective reports of pain. *Id.*

On February 13, 2006, state agency medical consultant George Chandler, M.D., completed a physical residual functional capacity ("RFC") assessment. Tr. at 225–32. He indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ladders/ropes/scaffolds and crawl; and avoid constant handling (gross manipulation) with the left upper extremity. *Id.*

On March 15, 2006, Plaintiff visited James N. Ruffing, Psy. D. ("Dr. Ruffing"), for a consultative mental status examination. Tr. at 233–36. Plaintiff reported childhood trauma that included witnessing her father shoot himself in the chest. Tr. at 233. She

7

endorsed abilities to care for her personal needs, prepare meals, clean, do laundry, drive, pay bills using cash, and visit a store. Tr. at 233–34. She denied attending church services and stated she had no friends and did not date. *Id.* Dr. Ruffing indicated Plaintiff completed the intake questionnaire and demonstrated spontaneous and responsive speech. Tr. at 234. However, he also noted Plaintiff's "presentation was marked by tension, sadness and tearfulness" and that she showed significant difficulty in regulating and controlling her emotions. *Id.* He stated Plaintiff was alert and responsive to questions, but had difficulty focusing. *Id.* She demonstrated a depressed and constricted affect and endorsed both emotional and neurovegetative symptoms of depression that included suicidal ideation; feelings of worthlessness, hopelessness, and helplessness; poor energy; absent libido; varied sleep; poor appetite; irritability; and psychomotor retardation. *Id.* Dr. Ruffing observed Plaintiff to be fully oriented, to demonstrate relevant and coherent thoughts, and to show no evidence of psychosis. *Id.* He indicated Plaintiff's abilities to attend and focus were impaired and that her cognitive processing speed was slowed. *Id.* Plaintiff remembered three of three unrelated words immediately and two of three words after a five-minute delay. *Id.* She showed abilities for basic and general knowledge, simple calculations, and serial sevens. *Id.* Dr. Ruffing's diagnostic impression was severe dysthymic disorder with possible major depressive disorder. *Id.*

On March 24, 2006, state agency consultant Debra C. Price, Ph. D. ("Dr. Price"), reviewed the record and completed a psychiatric review technique form ("PRTF"). Tr. at 236–49. Dr. Price considered Listing 12.04 for affective disorders and found that Plaintiff had severe dysthymia and possible major depressive disorder. Tr. at 236, 239. She

assessed Plaintiff as having mild restriction of activities of daily living ("ADLs"), moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 246. Dr. Price also completed a mental RFC assessment and indicated Plaintiff was moderately limited with respect to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; and to interact appropriately with the general public. Tr. at 250–52.

Plaintiff presented to the emergency room ("ER") at Upstate Carolina Medical Center ("UCMC") on April 15, 2006, with a complaint of anterior chest pain. Tr. at 255. The provider observed Plaintiff to have chest wall tenderness and diagnosed musculoskeletal chest wall pain. Tr. at 256.

On April 18, 2006, Plaintiff presented to Howard Klickman, M.D. ("Dr. Klickman"). Tr. at 272–74. She continued to report anterior chest discomfort with some numbness in her right arm and over her right scapula. Tr. at 274. Dr. Klickman suspected that Plaintiff's chest pain was caused by costochondritis, but indicated pulmonary embolus needed to be excluded based on Plaintiff's history of smoking and birth control pill use. Tr. at 272. He stated Plaintiff clearly needed treatment for depression and anxiety. *Id.* He indicated Plaintiff's secondary amenorrhea was likely due to rapid weight loss and underlying depression. *Id.* He stated Plaintiff's right shoulder and elbow pain may be simple biceps tendonitis and that Plaintiff may have a chronic pain syndrome. *Id.* Dr. Klickman prescribed Cymbalta to treat Plaintiff's depression and referred her for lab work. *Id.*

Plaintiff presented to Dr. Edwards on April 28, 2006, with a complaint of pain in her thoracic and lumbar muscles after lifting a heavy object. Tr. at 318. She reported difficulty with flexion and extension, but Dr. Edwards noted no neurological abnormalities. *Id.*

On May 9, 2006, Plaintiff reported pain in her anterior chest, low back, and bilateral wrists. Tr. at 270. Dr. Klickman indicated Plaintiff remained sad and tearful all the time and that her weight had decreased since her last visit. *Id.* Plaintiff indicated no relief from Cymbalta and endorsed an onset of nightmares since beginning the medication. *Id.* Dr. Klickman observed Plaintiff to be tender in her anterior chest and wrists. *Id.* He noted that Plaintiff had some psychomotor agitation. *Id.* He discontinued Cymbalta and prescribed Remeron. *Id.*

Plaintiff presented to Dr. Edwards on June 9, 2006, with complaints of severe pain in her lumbosacral spine and numbness in her thighs. Tr. at 317. She indicated that she injured her back when she lifted a mop bucket. *Id.* Dr. Edwards detected no neurological abnormalities. *Id.*

Plaintiff followed up with Dr. Klickman on June 14, 2006. Tr. at 268. She complained of pain in her anterior chest and wrists and remained sad, tearful, anxious, and worried. *Id.* She reported no relief from Remeron. *Id.* She indicated that she had frequent suicidal thoughts, but no plan. *Id.* Dr. Klickman observed Plaintiff to be very tearful, to have an obvious sad and dejected mood, to make poor eye contact, to have a palsy of speech, and to have increased psychomotor activity that was consistent with anxiety. *Id.* He indicated Plaintiff had fair judgment and insight and experienced no

hallucinations. *Id.* He assessed major depression with anxiety. *Id.* He referred Plaintiff to the mental health clinic for evaluation, but stated that he felt that Plaintiff should be admitted for inpatient psychiatric treatment. *Id.* He indicated to Plaintiff that her mental illness required specialized mental health treatment that he was unable to provide. *Id.*

Plaintiff presented to John H. Cathcart, Jr., M.D. ("Dr. Cathcart"), at SAMHC the next day. Tr. at 279. She endorsed side effects from Cymbalta and Zoloft. *Id.* She indicated a history of suicidal ideations, but denied psychotic feelings. *Id.* Dr. Cathcart diagnosed depressive disorder, not otherwise specified ("NOS"), and prescribed Lexapro. *Id.* On June 26, 2006, Plaintiff reported to Dr. Cathcart that she had been unable to take Lexapro because of bloating, diarrhea, and indigestion. Tr. at 278. She endorsed panic attacks that caused her to break into a sweat and have difficulty breathing. *Id.* Dr. Cathcart indicated Plaintiff was extremely thin and weighed only 116 pounds. *Id.* He prescribed Paxil CR and instructed Plaintiff to take it in the morning with food. *Id.* He indicated that if Plaintiff were unable to tolerate Paxil CR he may need to discontinue all medications until her stomach problems could be treated by another physician. *Id.*

State agency medical consultant William Crosby, M.D., completed a physical RFC assessment on September 11, 2006, and indicated Plaintiff was restricted as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently handle and push/pull using hand controls; and occasionally climb ladders/ropes/scaffolds and crawl. Tr. at 288–94.

On September 12, 2006, state agency consultant Xanthia Harkness, Ph. D. ("Dr. Harkness"), completed a PRTF. Tr. at 295–307. She considered listings 12.04 for affective disorders and 12.06 for anxiety-related disorders and assessed Plaintiff as having mild restriction of ADLs, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. *Id.* Dr. Harkness also completed a mental RFC assessment and indicated Plaintiff was moderately limited with respect to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; and to interact appropriately with the general public. Tr. at 309–11.

Plaintiff was discharged from treatment at SAMHC on September 14, 2006, and the discharge summary indicates she dropped out of or rejected services. Tr. at 313.

Plaintiff followed up with Dr. Edwards on November 6, 2006, and reported severe pain in her sacrococcygeal area that radiated to her legs. Tr. at 316. Dr. Edwards described Plaintiff as depressed and tearful as a result of stress. *Id.* On November 14, 2006, Plaintiff complained of pain in her left lumbosacral area that radiated to her left thigh. Tr. at 316. She indicated it was relieved only slightly by Lortab. *Id.* Plaintiff complained of continued low back pain to Dr. Edwards on February 14, 2007. Tr. at 315. Dr. Edwards diagnosed arthritis and depression and prescribed Lortab and Celexa. *Id.*

Plaintiff presented to the ER at UCMC with chest pain on February 17, 2007. Tr. at 326–28. She reported numbness to her right arm, shoulder, and left chest; abdominal

pain; and shortness of breath. Tr. at 326. Jane Wasson, M.D., noted that Plaintiff was anxious and depressed and diagnosed acute anxiety and acute depression. Tr. at 327–28.

On April 9, 2007, Plaintiff complained of generalized arthritic soreness, but rejected a trial of Lidocaine patches. Tr. at 314. Dr. Edwards indicated Plaintiff was under stress at home. *Id.* He continued her prescription for Lexapro and added a prescription for Valium. *Id.*

Plaintiff presented to the ER at UCMC with a cough and shortness of breath on July 28, 2007. Tr. at 365. She indicated she smoked three packs of cigarettes per day. *Id.* The physician indicated a clinical impression of acute bronchospasm. Tr. at 366. On August 14, 2007, Plaintiff followed up with Andre Abreu, M.D. ("Dr. Abreu"), regarding pulmonary nodularity. Tr. at 323–24. Plaintiff reported a cough and chronic dyspnea on exertion. Tr. at 323. Dr. Abreu indicated that malignancy could not be excluded. Tr. at 324. He recommended Plaintiff undergo a computed tomography ("CT") scan of her chest. *Id.* He diagnosed chronic obstructive pulmonary disease ("COPD") and instructed Plaintiff to stop using tobacco. *Id.* He prescribed Advair, Spiriva, and Combivent for COPD and Chantix for smoking cessation. *Id.* On November 20, 2007, a chest CT scan showed a stable calcified granuloma in the upper lobe of Plaintiff's right lung. Tr. at 363. Plaintiff followed up with Dr. Abreu the next day and denied shortness of breath. Tr. at 333. Dr. Abreu diagnosed bilateral calcified nodules and stable COPD. *Id.* He advised Plaintiff to stop using tobacco and to follow up for another CT scan in six months. *Id.*

Plaintiff presented to the ER at UCMC on December 23, 2008, following a motor vehicle accident. Tr. at 357. Her knee was tender to palpation and she had reduced ROM

in her knee and right shoulder. Tr. at 358. The physician observed diffuse muscle tenderness in Plaintiff's spine. *Id.* X-rays indicated no acute abnormalities. *Id.* On January 1, 2009, Plaintiff again presented to the ER with complaints of pain in her lower back, right upper leg, and right knee. Tr. at 354. The physician observed mild tenderness to palpation in Plaintiff's right paralumbar muscles, but noted no other abnormal findings. Tr. at 355. He diagnosed acute lumbar strain and arthralgia. *Id.*

On January 28, 2009, Plaintiff's attorney referred her to Dr. Ruffing for a mental status evaluation. Tr. at 340–46. Dr. Ruffing indicated Plaintiff completed the intake questionnaire fully and accurately. Tr. at 341. He stated the information in his assessment was based on Plaintiff's reports and her medical and psychological records. *Id.* Plaintiff indicated that she spent most days at home and became irritable when around others. Tr. at 343. She endorsed abilities to care for her personal needs, prepare meals, clean, and occasionally drive. *Id.* She indicated she sometimes went into stores with her mother, but typically became anxious and had to return to the car while her mother continued to shop. *Id.* Dr. Ruffing described Plaintiff as adequately groomed and alert, involved, and responsive throughout the exam. Tr. at 344. He observed Plaintiff to be pleasant and cooperative and to maintain eye contact. *Id.* He stated Plaintiff laughed minimally, but generally demonstrated poor emotional regulation and control. *Id.* Plaintiff demonstrated normal speech and language. *Id.* She showed some affective constriction and flattening. *Id.* Dr. Ruffing indicated Plaintiff's mood was depressed and that she demonstrated lethargy and psychomotor retardation. *Id.* Plaintiff endorsed emotional and neurovegetative symptoms of depression that included frequent crying spells, sadness,

14

worthlessness, hopelessness, helplessness, uselessness, disturbed sleep cycles, difficulty staying asleep, absent libido, anhedonia, social isolation, suicidal ideation, and a lack of motivation. *Id.* Plaintiff denied having been hospitalized for psychiatric reasons. *Id.* She indicated she had stopped attending mental health treatment because her insurance lapsed. *Id.* She stated she experienced at least one panic attack per day that lasted from one to two hours and involved shortness of breath, chest pain, smothering sensations, shaking, and scratching. *Id.* Plaintiff was oriented to all spheres and demonstrated intact thought processes and content. Tr. at 345. Dr. Ruffing indicated Plaintiff "was inconsistent in her capacity to attend and focus secondary to her emotional distress." *Id.* He observed that Plaintiff had slowing cognitive processing speed that was consistent with evidence of psychomotor retardation. *Id.* Plaintiff's memory and cognitive ability were generally intact. *Id.* Dr. Ruffing diagnosed severe, recurrent major depressive disorder and panic disorder with agoraphobia. Tr. at 346. He stated Plaintiff's prognosis related to her emotional functioning was poor, and explained as follows: "[e]motional dysfunction has been long-standing with emotional dysfunction dating at least to my first contact with Lydia in March 2006. Despite treatment efforts, her condition has been refractory to psychiatric and psychosocial treatment efforts." *Id.* However, he stated Plaintiff maintained the mental competency necessary to manage her finances. *Id.* He opined "based on Ms. Lydia's interpersonal interaction and emotional functioning during this examination" that "she would have significant emotional instability and psychological and emotional difficulty interacting appropriately with the public or

coworkers" and "would struggle, secondary to emotional dysfunction, to manage the concentration, persistence and pace required in a typical eight-hour workday." *Id.*

Plaintiff presented to Dr. Mourtada for a second consultative examination on January 29, 2009. Tr. at 347–49. Plaintiff reported depression and pain in her low back, bilateral wrists, and knee. Tr. at 347. She denied use of tobacco and indicated she had stopped using it in 2007. Tr. at 347–48. Dr. Mourtada observed Plaintiff to demonstrate 60 degrees of flexion and extension in her left wrist; 60 degrees of flexion and zero degrees of extension in her lumbar spine; antalgic gait; reduced lumbar lordosis; 4+/5 motor strength in her right upper extremity and 4-/5 motor strength in her left upper extremity; impaired sensation over her distal forearm; 1+/4 deep tendon reflexes; 4/5 muscle strength in the bilateral lower extremities; impaired sensation over the right thigh; and negative straight-leg raising test. Tr. at 348–49. His impressions included low back pain, left wrist pain, and depression. Tr. at 349. He recommended Plaintiff obtain further evaluation with x-rays and MRI of her back and left wrist. *Id.* He indicated Plaintiff should return to a psychiatrist for better control of her depression. *Id.* Dr. Mourtada prescribed Cymbalta, Lortab, and Valium. *Id.*

Plaintiff presented to Heather Esquivel, M.D. ("Dr. Esquivel"), on May 6, 2009, for an initial evaluation. Tr. at 698–700. Dr. Esquivel observed Plaintiff to be tender to palpation diffusely over her lumbar spine and SI region bilaterally. Tr. at 699. She indicated impressions of depressive disorder, generalized anxiety disorder, lumbago, and COPD. *Id.* Dr. Esquivel indicated Plaintiff may need an MRI and a referral to pain

management. *Id.* She informed Plaintiff that she would need to follow up with a mental health provider to obtain long-term treatment with benzodiazepines. *Id.*

On May 13, 2009, an MRI of Plaintiff's lumbar spine indicated mild disc bulges at multiple levels. Tr. at 352–53. On January 17, 2014, x-rays of Plaintiff's bilateral hips showed no bony injury. Tr. at 702. X-rays of Plaintiff's lumbar spine indicated some spondylosis. Tr. at 703. X-rays of Plaintiff's bilateral wrists indicated some ulnar minus anomaly that was worse on the right than on the left. Tr. at 704.

On January 25, 2014, Plaintiff presented to Branham Tomarchio, M.D. ("Dr. Tomarchio"), for a consultative examination. Tr. at 715–18. Dr. Tomarchio indicated he observed Plaintiff exit her car in the parking lot and walk into the office without difficulty. Tr. at 716. Plaintiff had some difficulty with the squatting maneuver, but Dr. Tomarchio observed no other objective evidence of deficits to her functional capacity. Tr. at 717–18. He indicated no restrictions in a medical source statement. Tr. at 709–14.

On January 28, 2014, Plaintiff presented to Todd Morton, Ph. D. ("Dr. Morton"), for a mental status evaluation. Tr. at 722–25. Dr. Morton noted that Plaintiff was very thin. Tr. at 722. He observed Plaintiff to be adequately groomed; to be fully oriented and alert; to speak in a clear and organized manner; and to have intact short-term memory. *Id.* Dr. Morton noted Plaintiff was able to recall three items over a 10-minute span, but had poor long-term memory. *Id.* He indicated Plaintiff had an unstable affect and a depressed mood and that she cried throughout the evaluation. *Id.* Plaintiff denied taking medications and stated she could not afford them. *Id.* She complained of frequent crying, irritability, excessive sleep, decreased appetite, frequent suicidal ideation, low energy, feelings of

hopelessness, anxiety in public, exaggerated startle response, and hypervigilance. Tr . at 722–23. Plaintiff reported hallucinations and frequent intrusive recollections of her father's suicide and abuse inflicted by her ex-husband. Tr. at 723. Plaintiff indicated she spent most days sleeping excessively and staring out her window. *Id.* She stated she left her house twice a week, but did not drive. *Id.* She indicated she had been arrested in July 2013 for public disorderly conduct, after getting into an argument with her daughter. Tr. at 724. Dr. Morton indicated Plaintiff was experiencing severe symptoms of depression and mild symptoms of psychosis. *Id.* He stated Plaintiff had fairly severe PTSD and was very anxious in social settings. *Id.* He described Plaintiff as paranoid, but not delusional. *Id.* He stated "[b]ecause of her anxiety related to PTSD and her paranoia[,] she would be frequently distracted from tasks in the workplace." *Id.* He further indicated he believed Plaintiff "would not be able to maintain her attention on a simple repetitive task if there were other people in the work environment." *Id.* He stated Plaintiff had "poor control of her emotions due to depression and PTSD" and "would be prone to emotional outbursts in the work setting" that would "result in negative relationships with her coworkers." *Id.* He indicated he observed no evidence of malingering and did not believe Plaintiff to be exaggerating her symptoms. *Id.* He stated he believed Plaintiff would be able to manage her funds if she were awarded benefits. *Id.* Dr. Morton's diagnostic impressions included severe, recurrent major depressive disorder with psychotic features, PTSD, and social anxiety disorder. Tr. at 725.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony[1]

i.    January 22, 2009

At the hearing on January 22, 2009, Plaintiff testified that she lived with her 14-year-old daughter. Tr. at 35. She indicated that she last worked at Moss Mini-Mart in March or April 2003. *Id.* She stated she had filed a Workers' Compensation claim against her former employer and had received a $15,000 settlement in 2004. Tr. at 36. She indicated she had injured her right knee and broken her left hand. Tr. at 37. She testified she underwent surgery to her left hand and that her doctor had suggested she undergo a second surgery to implant a steel plate. *Id.* She stated she declined the additional surgery because her doctor could not guarantee that her symptoms would improve. *Id.*

Plaintiff testified that she frequently dropped items. Tr. at 37–38. She stated she had difficulty with both her hands. Tr. at 38. She indicated that her doctor had suggested she undergo treatment for her left hand before pursuing treatment for her right hand. *Id.* She stated she was going through a divorce, became depressed, and failed to follow up for treatment of her right hand. *Id.* She indicated she could not hold a gallon of milk. Tr. at 39.

Plaintiff testified she continued to have difficulty with her right leg. Tr. at 40. She stated her leg became numb from her kneecap to the back side of her leg and through her

---

[1] Plaintiff waived her right to appear and testify at the hearing on July 10, 2014. Tr. at 652.

hips. *Id.* She indicated she had difficulty sitting and standing for long periods. Tr. at 40–41. Plaintiff stated she had received no treatment for her right knee since 2005. Tr. at 48–49. She indicated she had pain in the top of her hips that resulted from her ex-husband kicking her in the tailbone with steel-toed boots. Tr. at 49. She stated she experienced pain from the top of her hips to the back of her leg. *Id.*

Plaintiff testified she had difficulty with her nerves because she had witnessed her father shoot himself and had experienced physical and mental abuse from her ex-husband. Tr. at 43. She stated her nerves had worsened after she was injured at work. Tr. at 44. She indicated she was frustrated because she was unable to do anything. *Id.*

Plaintiff testified she had not recently visited a doctor because she lacked the money to pay for treatment. Tr. at 41. She indicated she had previously been covered by Medicaid, but that her coverage lapsed approximately a year-and-a-half earlier. Tr. at 42. Plaintiff denied having pursued free medical treatment. Tr. at 46. She denied having been hospitalized overnight. Tr. at 46, 47. She stated she had been taking Cymbalta for depression for about a year, but indicated it provided no relief. *Id.* She indicated she had used tobacco in the past, but stated she stopped using tobacco products a year-and-a-half earlier. Tr. at 46–47. She testified she used an Abreva inhaler on a daily basis. Tr. at 47.

Plaintiff testified she seldom shopped for groceries because she did not like to be around a lot of people. Tr. at 39. She indicated her daughter assisted her by washing and folding clothes and preparing meals. *Id.* Plaintiff stated she folded some clothing and dusted and cleaned her living room and kitchen infrequently. Tr. at 50. She indicated she had a driver's license and drove once or twice per week. Tr. at 51. She stated she had not

20

attended church since 2003. *Id.* She indicated she visited her mother and sister, but denied seeing any other relatives or friends on a frequent basis. Tr. at 51–52. She stated she seldom went out to eat or to her daughter's school activities. Tr. at 52, 54. She indicated her mother and sister paid her bills. Tr. at 54.

ii.    November 21, 2013

At the hearing on November 21, 2013, Plaintiff testified she was 45 years old. Tr. at 466. She indicated she lived with her mother and daughter. *Id.* She denied having worked since 2005. *Id.*

Plaintiff testified that she was unable to work because of problems with her bilateral wrists, right knee, and back. Tr. at 467–69. She endorsed difficulty lifting over five pounds. Tr. at 468. She indicated she had difficulty holding on to items. Tr. at 480. She described her right wrist pain as an eight and her left wrist pain as a nine on a 10-point scale. Tr. at 485–86. She stated her right knee sometimes gave out. Tr. at 469. She rated the pain in her right knee as a six. Tr. at 482. She indicated her back hurt in the spot where she had suffered a broken tailbone. Tr. at 469. She stated she experienced pain that radiated through her hips and down the back side of her leg. *Id.* She indicated she had difficulty sitting for long periods. Tr. at 470. She rated the pain in her back as a 10. Tr. at 481.

Plaintiff testified that her psychological condition had worsened. Tr. at 471. She indicated she became ill and upset and felt like others were talking about her all the time. *Id.* She stated she could not be around a lot of people at one time. *Id.*

21

Plaintiff testified that she spent the majority of a typical day lying down in her bedroom. Tr. at 472. She stated she typically awoke between 6:00 and 8:00 in the morning and went to bed between 7:30 and 8:00 in the evening. *Id.* She indicated she watched television, prepared meals, and read the Bible. Tr. at 472–73. She stated she would sometimes lie on the floor to reduce her back pain. Tr. at 473. She indicated she had left her home on approximately 15 occasions during the prior month. Tr. at 474. She stated she accompanied her mother as she paid bills and visited the grocery store, but that her mother drove. Tr. at 475. Plaintiff indicated that no friends had visited her in seven to nine years. Tr. at 476. She testified that she attended church on three Sundays per month. Tr. at 490. She stated she picked up her clothes and occasionally swept the floors. Tr. at 477.

Plaintiff testified that she lacked the financial resources to visit a doctor. Tr. at 478. She stated she had not received treatment for her wrist in years and was unable to recall when she last received treatment for her back. Tr. at 479, 482. She indicated she was not aware of a free clinic that could offer treatment. *Id.* She stated she had visited the hospital twice for breathing difficulty, but denied being hospitalized overnight for any reason. Tr. at 486–87. She denied taking prescription medication for pain and indicated that over-the-counter medications had generally been ineffective. Tr. at 483, 488.

b.    Vocational Expert Testimony[2]

i.    January 22, 2009

Vocational expert ("VE") Benson Hecker, Ph. D., reviewed the record and testified at the hearing. Tr. at 57–65. The VE categorized Plaintiff's PRW as a winder, as medium in exertional level with a specific vocational preparation ("SVP") of three; a spinner, as medium with an SVP of three; a creeler, as medium with an SVP of two; a cashier, as light with an SVP of two; and a stock clerk, as heavy with an SVP of four. Tr. at 59. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift 20 pounds occasionally and 10 pounds frequently; could stand for six hours out of an eight-hour day; could walk for six hours out of an eight-hour day; could sit for six hours out of an eight-hour day; could never climb ladders, ropes, or scaffolds; could frequently climb, balance, stoop, kneel, crouch, and crawl; could occasionally reach and handle with the left upper extremity; should avoid concentrated exposure to fumes; could perform simple one- and two-step tasks; would require a low-stress work environment that did not involve production work; and could have only occasional contact with the public. Tr. at 59–60. He asked if the hypothetical individual could perform any of Plaintiff's PRW. Tr. at 60. The VE responded that the hypothetical individual could not perform Plaintiff's PRW. *Id.* The ALJ asked if the individual could perform other jobs available in the regional or national economy. *Id.* The VE indicated the individual could perform "an extremely limited range of work" and identified light jobs with an SVP of

---

[2] VE Robert E. Brabham, Sr., Ph. D., was present during the hearing on July 10, 2014, but he did not provide testimony. *See* Tr. at 517.

two as a maid, *Dictionary of Occupational Titles* ("*DOT*") number 323.687-014, with 915,890 positions in the national economy and 18,020 positions in the state, and a merchant patroller, *DOT* number 372.067-038, with 1,032,260 positions in the national economy and 12,860 positions in the state. *Id.* The ALJ next asked the VE to assume the same limitations set forth in the first hypothetical question, but to further assume the individual would be absent from work at various times and at her own discretion. Tr. at 61. The ALJ asked if the additional restriction would change the VE's answer to the first question. *Id.* The VE indicated it would preclude the jobs identified and all other work. *Id.*

Plaintiff's attorney asked the VE to assume that the hypothetical individual would have significant difficulty focusing and attending to work and poor emotional stability such that she would occasionally cry and exhibit emotional symptoms for one-third of the workday. Tr. at 62–63. The VE responded that the individual would be able to perform no work. Tr. at 63. Plaintiff's attorney asked the VE to assume the same limitations set forth in the ALJ's first hypothetical, but to further assume that the individual would present with tension, sadness, and tearfulness during a typical 30-minute period. *Id.* He asked if the individual would be able to engage in competitive employment. Tr. at 63–64. The VE responded that if the individual were crying and unable to attend, it would preclude her from engaging in competitive employment. Tr. at 64. Plaintiff's attorney asked the VE to consider a hypothetical individual of Plaintiff's vocational profile and to further assume that the individual was limited as Plaintiff described in her testimony. Tr.

at 65. He asked if an individual with those limitations would be able to engage in competitive employment. *Id.* The VE responded that the individual would not. *Id.*

ii. November 21, 2013

VE Pedro M. Roman reviewed the record and testified at the hearing. Tr. at 491–506, 511–12. The VE categorized Plaintiff's PRW as a stocker in a supermarket, *DOT* number 299.367-014, as heavy with an SVP of four. Tr. at 493. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift 20 pounds occasionally and 10 pounds frequently; could stand for six hours during an eight-hour day; could walk for six hours during an eight-hour day; could sit for six hours during an eight-hour day; could never climb ladders, ropes, or scaffolds; could occasionally crawl; could frequently climb, balance, stoop, kneel, crouch, reach, and handle; should avoid concentrated exposure to fumes; and could perform simple one- and two-step tasks in a low-stress work environment that did not involve production or fast-paced work and required only occasional public contact. Tr. at 493–94. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 494. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of two as an inspector and hand packager, *DOT* number 559.687-074, with 3,181 positions in South Carolina and 131,201 positions in the national economy; a mail clerk, *DOT* number 209.687-026, with 664 positions in South Carolina and 72,021 positions in the national economy; and a pricing tagger, *DOT* number 209.587-034, with 4,637 positions in South Carolina and 325,401 positions in the national economy. *Id.*

The ALJ next asked the VE to assume that the individual would experience difficulty attending to the work station because of concentration and attention problems that would occur on a daily basis, but that may vary in duration. Tr. at 495. The VE testified that there would be no work the individual could perform because of her unreliability. *Id.*

Plaintiff's attorney asked the VE to assume the same limitations and restrictions set forth in the ALJ's first hypothetical question, but to further assume the individual could only perform occasional fine or gross manipulation with her left hand. Tr. at 496. The VE testified that the additional limitation would reduce the number of available jobs by 10 to 20 percent, but that Plaintiff could still perform the jobs because she was right-hand dominant. *Id.*

Plaintiff's attorney next asked the VE to assume the individual was limited to occasionally bilateral fine and gross manipulation. Tr. at 496. The VE testified the individual would be unable to perform the jobs identified because they would require the use of both hands. *Id.*

Plaintiff's attorney asked the VE to consider an individual of Plaintiff's vocational profile and to further assume the individual could only interact with supervisors for 40 percent of a workday. Tr. at 504. He asked if the individual could perform competitive employment. *Id.* The VE responded that the individual could not. *Id.*

Plaintiff's attorney asked the VE to assume the same vocational profile and limitations in the ALJ's first question, but to further assume that the individual could only maintain attention and concentration for 30 percent of a workday. Tr. at 511. He asked if

the individual could perform competitive employment. *Id.* The VE indicated the individual could perform no work. *Id.*

Plaintiff's attorney asked the VE to assume the same vocational profile and limitations in the ALJ's first question, but to further assume the individual could only demonstrate reliability for 30 percent of the workday. Tr. at 512. The VE indicated there would be no work the individual could perform. *Id.*

c.     Medical Expert Testimony

Medical expert ("ME") Alfred G. Jonas, M.D. ("Dr. Jonas") testified by telephone during the hearing on July 10, 2014. Tr. at 530. He indicated he was a psychiatrist who maintained an active psychiatry practice in North Miami, Florida. Tr. at 531–32.

Plaintiff's attorney questioned Dr. Jonas regarding his curriculum vitae ("CV"). Tr. at 532–36. He specifically asked Dr. Jonas about a position described on the CV as "lecturer in psychiatry" at Harvard Medical School. Tr. at 533. Dr. Jonas indicated that he believed that to be the title Harvard Medical School assigned to his position, but indicated he did not actually lecture at Harvard Medical School. Tr. at 533–34. He stated he supervised psychiatry residents in his position as psychiatry medical director of a community clinic near Harvard Medical School. *Id.* Plaintiff's attorney objected to Dr. Jonas's qualifications, but the ALJ overruled the objection. Tr. at 541, 543.

Dr. Jonas testified that he had practiced psychiatry for a little over 30 years. Tr. at 542. He indicated he continued to treat 10 to 15 patients that he saw for an average of one hour, once a week. Tr. at 542–43.

Dr. Jonas indicated that Plaintiff had complained of wrist pain and low back pain, but that she had no functional limitations. Tr. at 544–45. Plaintiff's attorney objected to Dr. Jonas's testimony regarding Plaintiff's physical limitations and diagnoses on the basis that Dr. Jonas was called to testify as a psychiatrist. Tr. at 545. The ALJ overruled Plaintiff's objection, stating that Dr. Jonas's specialty as a psychiatrist went to the weight to be accorded his opinion instead of whether he could render an opinion as a physician. Tr. at 546.

Dr. Jonas testified that the record indicated diagnoses of dysthymic disorder, depression, depression with psychosis, panic disorder with agoraphobia, PTSD, and social anxiety that generally fell under Listings 12.04 and 12.06. Tr. at 547–48. He indicated the diagnosis of PTSD appeared accurate, but that the other diagnoses were uncertain because of ambiguities in the record. Tr. at 548. He stated that Plaintiff was prescribed low-to-medium doses of antidepressant and antianxiety medications during the time that she was receiving mental health treatment. *Id.* Dr. Jonas suggested that Plaintiff's ADLs were generally unimpaired. Tr. at 548–49. He acknowledged that Plaintiff had some impairment to social functioning, but that her impairment was mild-to-moderate. Tr. at 549. He stated Plaintiff had intact concentration, persistence, and pace. *Id.* He pointed out that Dr. Morton considered Plaintiff to have a potentially significant impairment to concentration, persistence, or pace, but stated that conclusion was refuted by the fact that Plaintiff was able to remember three words after 10 minutes. Tr. at 550.

The ALJ stated that he perceived inconsistencies in Dr. Morton's record and opinion and asked that Dr. Jonas comment on those inconsistencies. Tr. at 551. Dr. Jonas

stated that Dr. Morton's indication that Plaintiff would be able to manage finances independently was inconsistent with his indication that she would have marked impairment in her abilities to make work-related decisions, marked to extreme social impairment, and potentially significant impairment to concentration, persistence, or pace. *Id.*

Dr. Jonas testified that he had never met or examined Plaintiff. Tr. at 553. Plaintiff's attorney questioned Dr. Jonas's citation of only parts of Dr. Ruffing's statement and asked that he explain his conclusion. Tr. at 557–58. Dr. Jonas testified that Plaintiff would lack the mental and emotional capacity to manage finances if, as Dr. Ruffing suggested, her condition were refractory to treatment and she were so emotionally unstable that she could not interact with the public or coworkers and would struggle to manage the concentration, persistence, or pace required in a typical workday. Tr. at 558. Plaintiff's attorney asked Dr. Jonas what kind of finances Plaintiff would be expected to manage. Tr. at 559. Dr. Jonas indicated that he did not know the specific type of finances Plaintiff would be expected to manage, but that he thought she would need to be able to meet expenses and to resolve problems. *Id.* Plaintiff's attorney asked Dr. Jonas to explain his reason for rejecting Dr. Ruffing's opinion that Plaintiff would struggle secondary to emotional dysfunction to manage concentration, persistence, and pace required in a typical eight-hour workday. Tr. at 560. Dr. Jonas stated that because Dr. Ruffing did not test Plaintiff for eight hours, he was only guessing. Tr. at 560–62.

2.    The ALJ's Findings

In his decision dated December 5, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2007.
2.    The claimant has not engaged in substantial gainful activity since May 1, 2005, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: COPD, status post left wrist ligament tear and surgery, bilateral carpal tunnel syndrome, degenerative disc disease of the lumbar spine, internal derangement of the right knee, and affective and anxiety-related disorders, including depression, anxiety, and PTSD (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant could lift 20 pounds occasionally and 10 pounds frequently; the claimant could sit six out of eight hours, stand six out of eight hours, and walk six out of eight hours in a workday; she could never climb ladders, ropes, or scaffolds and frequently climb ramps and stairs; the claimant could frequently [engage in] balancing, stooping, kneeling, and crouching; the claimant could occasionally crawl; she could reach and handle with the upper extremities on a frequent basis; she should avoid concentrated exposure to fumes; the claimant is limited to simple, one- or two-step tasks in a low-stress environment with non-production work, such as no fast-paced assembly-like work, and only occasional public contact.
6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
7.    The claimant was born on September 6, 1967 and was 37 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).
8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).
9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 397–450.

II.    Discussion

Plaintiff alleges the Commissioner erred in failing to properly consider the medical opinions of record. The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983)

(discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii). 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

Plaintiff argues the ALJ improperly disregarded the opinions of the treating and examining physicians and failed to adequately explain his decision to accord significant weight to the non-examining physicians' opinions. [ECF No. 13 at 23]. She maintains that the ALJ assessed her RFC before reviewing the opinion evidence and rejected all opinions that were contrary to the RFC he assessed. *Id.* at 23–25.

The Commissioner argues the ALJ adequately considered the medical opinions of record and relied upon substantial evidence to support the opinions that he accepted and rejected and to assess Plaintiff's RFC. [ECF No. 15 at 14–21].

34

ALJs must consider and evaluate every medical opinion of record. 20 C.F.R. §§ 404.1527(b), (c), 416.927(b), (c); SSR 96-5p. Medical opinions include the opinions of treating and examining physicians and psychologists, state agency medical and psychological consultants, MEs consulted at administrative hearings, and other non-examining medical sources. 20 C.F.R. §§ 404.1527(c),(e), 416.927(c),(e). The regulations direct ALJs to accord controlling weight to the opinions of treating physicians and psychologists that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, if the record does not contain a treating provider's opinion or if a treating provider's opinion is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence of record, the ALJ should weigh all the medical opinions of record. *Id.*; SSR 96-2p. The factors to be considered in weighing the medial opinions are set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c) and include the following: (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. §§ 404.1527(c), 416.927(c).

The specific provisions of 20 C.F.R. §§ 404.1527(c) and 416.927(c) guide ALJs in weighing the relevant factors. "Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). In general, treating sources are also to be given more weight, even if their opinions are not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or are inconsistent with the other substantial evidence in the case record.[5] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004). Finally, medical opinions from specialists regarding medical issues related to their particular areas of specialty should carry greater weight than opinions from physicians regarding impairments outside their areas of specialty. 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).

While express discussion of each factor in 20 C.F.R. §§ 404.1527(c) and 416.927(c) may not be required, an ALJ's decision should reflect that he considered and applied all the factors and accorded each opinion appropriate weight in light of the evidence of record. *See Hendrix v. Astrue*, No. 1:09-1283-HFF, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010). This court should not disturb an ALJ's determination as to the

---

[5] Nevertheless, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).

weight to be assigned to a medical source's opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

In view of the foregoing authorities, the undersigned considers the ALJ's treatment of the opinions of the treating and examining providers and the ME. Because Plaintiff has not challenged the ALJ's findings regarding her physical functional abilities, the undersigned limits discussion to the opinions regarding her mental functioning.

### 1.     Treating and Examining Physicians' Opinions

#### a.     Dr. Klickman's Opinion

Plaintiff argues the ALJ assessed her RFC before considering the medical opinions and erred in giving little weight to Dr. Klickman's statement. [ECF No. 13 at 25]. The Commissioner maintains the ALJ cited several valid reasons for according little weight to Dr. Klickman's opinion. [ECF No. 15 at 17].

On December 20, 2008, Dr. Klickman submitted a report in which he stated that he determined Plaintiff's atypical chest pain was stemming from her depression and referred her for psychological treatment. Tr. at 337. He indicated Plaintiff's depression was severe, failed to respond to treatment with two anti-depressant medications, and resulted in real chest pain on a daily basis. *Id.* He stated pain was always distracting and could possibly distract Plaintiff from work tasks, but qualified that he did not specifically

assess Plaintiff's condition in vocational terms. *Id.* He indicated Plaintiff always presented as preoccupied with pain, sad, tearful, overly anxious, and worried. *Id.*

The ALJ indicated he gave some weight to Dr. Klickman's opinion. Tr. at 418. He stated he included restrictions in the RFC assessment to address Plaintiff's mental impairments and her pain. *Id.* He acknowledged Dr. Klickman's status as a treating physician, but indicated Dr. Klickman had only treated Plaintiff over a three-month period and that his treatment took place two-and-a-half years before he rendered his opinion. *Id.* The ALJ indicated Dr. Klickman did not articulate limitations regarding Plaintiff's ability to function in a work environment. *Id.* He stated Dr. Klickman lacked medical specialty in psychology and did not elect to treat Plaintiff's mental conditions. *Id.* The ALJ found that Dr. Klickman's treatment notes were consistent with the assessed RFC. Tr. at 419.

Despite Plaintiff's assertion to the contrary, it does not appear that the ALJ first assessed an RFC and then rejected Dr. Klickman's opinion because it failed to conform to that RFC. Instead, the ALJ found that Dr. Klickman's opinion did not assess restrictions in vocational terms, which seems reasonable in light of Dr. Klickman's statement that he "just was not evaluating her in those kind of vocational terms." *Compare* Tr. at 337, *with* Tr. at 418. The ALJ's explanation of his decision to give "some weight" to Dr. Klickman's opinion generally reflects consideration of the relevant factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c). He acknowledged the examining and treatment relationships, but cited the limited and remote treatment history as factors that weighed against according greater weight to the opinion. *See* Tr. at 418–19. He discussed

the supportability of Dr. Klickman's opinion in his own treatment notes and found that Dr. Klickman's treatment notes generally supported the assessed RFC and the determination that Plaintiff's chest pain was non-cardiac. Tr. at 418, 419. He addressed the specialty factor and noted that Dr. Klickman lacked specialization in the treatment area of psychology. Tr. at 418–19.

Although the ALJ provided a thorough explanation of his decision to give some weight to Dr. Klickman's opinion, it appears that the ALJ failed to adequately consider the consistency of Dr. Klickman's observations with the other evidence in the record. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). In particular, Dr. Klickman stated Plaintiff "always presented" as "sad, tearful, overly anxious, and worried." Tr. at 337. While Dr. Klickman's statement that it was possible Plaintiff's pain may distract her from work tasks was speculative and failed to reflect concrete vocational terms, his observation as to how Plaintiff "always presented" was relevant to consideration of other records that showed the same presentation. *See* Tr. at 210 (clinician noted Plaintiff to be tearful during session), 217 (Dr. Mourtada noted Plaintiff was crying during the exam), 234 (Dr. Ruffing indicated Plaintiff's presentation was marked by tension, sadness, and tearfulness and that she had significant difficulty regulating and controlling her emotions), 316 (Dr. Edwards described Plaintiff as depressed and tearful), 327–28 (Dr. Wasson noted that Plaintiff was anxious and depressed and assessed acute anxiety and acute depression), 344 (Dr. Ruffing indicated Plaintiff generally demonstrated poor emotional regulation and control during the exam), 722 (Dr. Morton observed that Plaintiff had an unstable affect and a depressed mood and that she cried throughout the evaluation). In light of the

ALJ's failure to consider the consistency of Dr. Klickman's opinion and observations with those of the other treating and examining physicians and psychologists, the undersigned recommends the court find that he did not adequately consider Dr. Klickman's opinion.

### b.     Dr. Ruffing's Opinions

Plaintiff argues the ALJ erred in assessing inconsistencies in Dr. Ruffing's statement and in failing to consider its consistency with Dr. Morton's opinion. [ECF No. 13 at 26, 31]. The Commissioner argues the ALJ followed the regulations in weighing Dr. Ruffing's opinions and appropriately concluded that they were inconsistent with the evidence. [ECF No. 15 at 15].

### 1.     March 15, 2006

On March 15, 2006, Dr. Ruffing found Plaintiff to have the following capacities:

> She can understand and respond to the spoken word. However, she had significant difficulty focusing and attending. She does demonstrate poor emotional stability. She would have impaired capacity for persistence, pace, and concentration. She would have difficulty performing more than simple tasks, and would struggle to understand, remember, and carry out more than simple instructions. She does appear to have minimal faculties necessary to manage her finances, but given her emotional distress, she may benefit from assistance in these affairs.

Tr. at 235.

The ALJ indicated the following with respect to Dr. Ruffing's March 2006 opinion:

> Overall, I give great weight to this opinion from Dr. Ruffing, which is generally consistent with the findings in the decision and the opinions of the State agency psychological medical consultants. For instance, I agree that mental conditions cause work related limitations of function. However,

>   I give little weight to Dr. Ruffing's statement as far as it can be construed
>   as inconsistent with the residual functional capacity.

Tr. at 424. The ALJ further explained that Plaintiff continued to engage in a variety of ADLs, did not stop working because of her mental condition, was able to complete the intake questionnaire, was adequately groomed and dressed, spoke appropriately, and was alert and responsive to questions. Tr. at 424–25. He pointed out that Plaintiff had not sought treatment for mental conditions in about a year and had no history of psychiatric hospitalization. Tr. at 425. He observed that Dr. Ruffing described Plaintiff as fully oriented with relevant and coherent thoughts, no evidence of psychosis, good memory, and basic knowledge and calculation abilities. *Id.* He stated Plaintiff was able to respond and maintained the faculties to manage her finances. *Id.* The ALJ agreed with Dr. Ruffing's opinion that Plaintiff "would have impaired capacity regarding persistence, pace, and concentration, as well as difficulty performing, understanding, remembering, and carrying out more than simple tasks," and indicated he included in the RFC assessment limitations "concerning the performance of basic mental work demands." Tr. at 425–26. However, he indicated Dr. Ruffing neglected to assess Plaintiff's mental work demands in functional terms. Tr. at 426.

A review of the ALJ's consideration of Dr. Ruffing's opinion reveals that he acknowledged the examining relationship and Dr. Ruffing's specialization, as required by 20 C.F.R. §§ 404.1527(c) and 416.927(c), but erred in his assessment of the supportability and consistency factors. *See* Tr. at 423–26. Dr. Ruffing's opinion can be summed up as follows: Plaintiff was capable of understanding and performing tasks, but

41

was expected to be unreliable in her performance of tasks because of her emotional instability. *See* Tr. at 233–35. The ALJ thoroughly explained that the restrictions set forth by Dr. Ruffing were unsupported because Plaintiff responded appropriately to questions, followed directions, engaged in certain ADLs, retained general knowledge, and performed simple calculations, but he neglected to acknowledge that Dr. Ruffing indicated Plaintiff's emotional instability would interfere with her ability to perform any tasks on a consistent basis.[6] The ALJ pointed to no evidence in Dr. Ruffing's exam report or the record as a whole to suggest Plaintiff retained greater emotional stability. He also failed to acknowledge the consistency of Dr. Ruffing's opinion with that of Dr. Morton and with the observations of other providers regarding Plaintiff's emotional presentation. *See* Tr. at 210, 234, 268, 270, 272, 316, 327, 344, 722. In light of these errors, the undersigned recommends the court find the ALJ did not adequately consider Dr. Ruffing's March 2006 opinion.

## 2. January 28, 2009

Dr. Ruffing completed an assessment of Plaintiff's mental ability to sustain work-related activities after he examined Plaintiff on January 28, 2009. Tr. at 338–39. Dr. Ruffing indicated that, as a result of depression and anxiety, Plaintiff could follow work rules for 80 to 90 percent of an eight-hour workday; could relate to coworkers for 40 to 50 percent of an eight-hour workday; could deal with the public for 40 to 50 percent of an

---

[6] Although Plaintiff may be fully cognizant of a job's requirements and capable of performing certain rote tasks, if she cried throughout the workday or was incapable of completing the workday because of her emotions, the VE testimony suggests that she would lack the emotional stability necessary to perform any jobs. *See* Tr. at 62–65, 511–12.

eight-hour workday; could use judgment for 80 to 90 percent of an eight-hour workday; could interact with supervisors for 40 to 50 percent of an eight hour workday; could deal with ordinary work stresses for 20 to 40 percent of an eight-hour workday; could function independently for 60 to 90 percent of an eight-hour workday; and could maintain attention and concentration for 20 to 50 percent of an eight-hour workday.[7] Tr. at 338. He found that Plaintiff could understand, remember, and carry out complex job instructions 40 to 60 percent of the time; could understand, remember, and carry out detailed, but not complex job instructions 60 to 80 percent of the time; and could understand, remember, and carry out simple job instructions 80 to 100 percent of the time. *Id.* He stated Plaintiff could maintain her personal appearance 80 to 100 percent of the time; could behave in an emotionally stable manner 40 to 50 percent of the time; could relate predictably in social situations 30 to 50 percent of the time; and could demonstrate reliability 30 to 60 percent of the time. Tr. at 339. Dr. Ruffing noted that Plaintiff had difficulties secondary to emotional dysfunction. *Id.* Finally, he found that Plaintiff could manage benefits in her own best interest. *Id.*

The ALJ found that Dr. Ruffing's report and the record as a whole did not fully support Plaintiff's allegations or Dr. Ruffing's opinion. Tr. at 433. He stated that he gave some weight to Dr. Ruffing's report and statements to the extent that he found that depression and anxiety caused Plaintiff to have work-related limitations in function, difficulty interacting appropriately with the public, and problems maintaining

---

[7] Dr. Ruffing rated Plaintiff's limitations by circling and marking a letter "x" on gridlines. *See* Tr. at 338–39. The gridlines are relatively small and the percentages indicated above reflect the undersigned's interpretation of the areas marked on the gridlines.

concentration, persistence, and pace. *Id.* The ALJ indicated he considered these limitations in restricting Plaintiff to a low-stress work environment, but that he gave little weight to Dr. Ruffing's opinion to the extent that it suggested greater restrictions. *Id.* He found that some of Dr. Ruffing's findings did not fully support his opinions. *Id.* He pointed out that Plaintiff was fully oriented; had normal thought processes and thought content; had intact memory; demonstrated basic knowledge and ability to perform simple calculations; was able to accurately complete the intake questionnaire; and responded reliably to questions. *Id.* He observed that, despite Plaintiff's report of daily panic attacks, the medical records only described Plaintiff as "anxious or depressed on some occasions." *Id.* He indicated Plaintiff had been able to graduate from high school and work for years after witnessing her father's suicide. *Id.* He referenced Plaintiff's ADLs and found them to be inconsistent with the level of restriction Dr. Ruffing suggested. Tr. at 433–34. He observed that Plaintiff was adequately groomed; alert, involved, and responsive; pleasant and cooperative; maintained eye contact; and spoke normally during Dr. Ruffing's examination. Tr. at 434. The ALJ pointed out that many of Dr. Ruffing's findings were consistent with his 2006 findings, but that his reports of abnormal clinical signs were "not wholly consistent with the visit to the ER just a few weeks earlier, Dr. Mourtada's exam of the claimant the next day, and the visit to Regenesis a few months later in May 2009" and stated "[t]hese records bookend Dr. Ruffing's evaluation and generally contain either normal clinical signs of mental conditions, or the findings are no more than minimally abnormal from a psychiatric standpoint." *Id.*

44

The ALJ's evaluation of Dr. Ruffing's January 2009 opinion reflects more adequate consideration of the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c) than his evaluation of the March 2006 opinion, but the ALJ cited insufficient evidence to show that Dr. Ruffing's opinion was not supported by his examination and was inconsistent with the other evidence of record. Dr. Ruffing's observation of normal orientation, thought processes, thought content, grooming, responsiveness, language, and memory do not disprove his observations that Plaintiff would have significant difficulty relating to coworkers, interacting with supervisors, dealing with ordinary work stresses, maintaining attention and concentration, behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability. *See* Tr. at 338–39. Dr. Ruffing's opinion does not refute Plaintiff's capability in performing tasks, but rather suggests that she would be unreliable in performing them on a consistent basis because of her emotional reactions.

Although the ALJ pointed to specific records that he claimed refuted Dr. Ruffing's assessment, the undersigned notes that some of the providers referenced by the ALJ indicated Plaintiff demonstrated emotional instability. For example, the ALJ indicated Dr. Ruffing's observations were inconsistent with those of Dr. Mourtada, who examined Plaintiff the next day, but Dr. Mourtada indicated Plaintiff needed "to return to see a Psychiatrist for better control of her Depression."  *See* Tr. at 349. The ALJ also cited Plaintiff's visit to Regenerist in May 2009 to refute Dr. Ruffing's opinion, but the undersigned notes that a review of symptoms from that visit was positive for psychiatric or emotional difficulties. *See* Tr. at 698. Dr. Esquivel indicated Plaintiff was oriented "to

45

person, place and time with mood and affect appropriate to the situation," but her diagnostic impressions included depressive disorder and generalized anxiety disorder and she prescribed Cymbalta for depression. Tr. at 699. Despite the ALJ's assertion to the contrary, it appears that Dr. Esquivel's findings were consistent with those of Dr. Ruffing, who found Plaintiff to be fully oriented, but to demonstrate a mood and affect that were consistent with depression and anxiety. *Compare* Tr. at 344–45, *with* Tr. at 699. Furthermore, the ALJ ignored the observations of Plaintiff's emotional instability contained in the records of other examining providers. *See* Tr. at 210 (clinician at SAMHC), 268 (Dr. Klickman), 270 (Dr. Klickman), 272 (Dr. Klickman), 316 (Dr. Edwards), 327 (Dr. Wasson), 722 (Dr. Morton). In light of the foregoing, the undersigned recommends the court find the ALJ failed to adequately consider the supportability and consistency of Dr. Ruffing's January 2009 opinion.

c.    Dr. Morton's Opinion

Plaintiff argues the ALJ provided conflicting statements regarding the weight he accorded to Dr. Morton's opinion. [ECF No. 13 at 26–29]. She contends the ALJ erred in determining that Dr. Morton's opinion was inconsistent with Dr. Tomarchio's observations. *Id.* at 31. Plaintiff maintains the ALJ discounted Dr. Morton's opinion based on her lack of mental health treatment, but improperly failed to consider her inability to afford such treatment. *Id.* at 32.

The Commissioner argues the ALJ gave sufficient reasons for giving little weight to Dr. Morton's opinion. [ECF No. 15 at 18–20]. She maintains the ALJ considered

46

Plaintiff's allegation that she was unable to afford treatment, but pointed to evidence that suggested Plaintiff willfully chose not to obtain treatment. *Id.* at 19–20.

On January 28, 2014, Dr. Morton completed a medical source statement assessing Plaintiff's mental ability to do work-related activities. Tr. at 719–21. He found Plaintiff had extreme restriction in her abilities to interact appropriately with the public and with supervisors. Tr. at 720. He assessed marked restriction in Plaintiff's abilities to make judgments on complex work-related decisions, to interact appropriately with co-workers, and to respond appropriately to usual work situations and to changes in a routine work setting. Tr. at 719–20. He indicated Plaintiff had mild restriction to the following abilities: to make judgments on simple work-related decisions, to understand and remember complex instructions, and to carry out complex instructions. Tr. at 719. He found Plaintiff was only mildly limited in her abilities to understand and remember simple instructions and to carry out simple instructions. *Id.* Dr. Morton provided the following explanation for his assessment: "Due to depression and PTSD Ms. Lydia is often overwhelmed emotionally which impair[s] her ability to make judgments and decisions." *Id.* He further stated that "[d]ue to PTSD and depression Ms. Lydia is extremely emotionally volatile in her interactions with others." Tr. at 720. However, Dr. Morton indicated Plaintiff was capable of managing benefits in her own best interest. Tr. at 721.

The ALJ found that Dr. Morton's evaluation supported both Plaintiff's "allegations and the findings in the decision." Tr. at 437. He later stated that he agreed with Dr. Morton "that mental conditions cause work related limitations, particularly with

the claimant's ability to perform basic mental work demands," but that he gave "little weight to Dr. Morton's statements and opinions, as some of them overstate the claimant's limitations in terms of mental functioning." Tr. at 438. He pointed out that some of the limitations indicated by Dr. Morton were consistent with the assessed RFC, but that "Dr. Morton's markings concerning the claimant's ability to interact with supervisors, coworkers, and the public, and her capacity to respond to changes in the routine work setting overstate the claimant's level of functioning." *Id.* He indicated that "markings such as 'extreme' and 'marked' are not articulations of limitations in functional terms, and in general, Dr. Morton offers little objective support for his markings other than the claimant has depression and PTSD." Tr. at 438, 443. He further stated Dr. Morton's "markings and opinion primarily reflected only the claimant's current level of functioning" and failed to consider Plaintiff's "level of mental functioning prior to the current evaluation." Tr. at 438.

The ALJ pointed out that Dr. Morton's assessment and findings differed from those of Dr. Tomarchio, who examined Plaintiff only three days earlier. Tr. at 438–39, 443. He indicated Plaintiff had relatively little mental health treatment since her alleged onset date of disability and that she was not receiving treatment at the time of Dr. Morton's examination. Tr. at 439, 443. He stated Dr. Morton only referenced one treatment note, which reflected that "he did not review much of the record." Tr. at 439. He indicated Dr. Morton's opinion was inconsistent with his description of Plaintiff as having good attention to hygiene; communicating and understanding English well;

having intact memory; and being fully oriented with appropriate mood and affect and no suicidal ideation. *Id.*

The undersigned recommends the court find that the ALJ did not adequately consider the supportability and consistency of Dr. Morton's opinion. As he did with Dr. Ruffing's opinion, the ALJ pointed to evidence that suggested Plaintiff retained the abilities to follow instructions and to understand job tasks and requirements, but he did not adequately consider that Dr. Morton indicated Plaintiff was not emotionally capable of consistently completing job requirements. *See* Tr. at 719 ("Due to depression and PTSD Ms. Lydia is often overwhelmed emotionally which impair[s] her ability to make judgments and decisions."), 720 (extreme restriction in abilities to interact appropriately with the public and with supervisors and marked limitations in abilities to interact appropriately with coworkers and to respond appropriately to usual work situations and to changes in a routine work setting). While the ALJ indicated that qualifications of "marked" and "extreme" restrictions did not indicate functional terms, the undersigned notes that the opinion form, which Dr. Morton completed at the request of the Social Security Administration ("SSA"), defines "marked" as follows: "There is a serious limitation in this area. There is a substantial loss in the ability to effectively function." Tr. at 719. The form defines "extreme" as follows: "There is major limitation in this area. There is no useful ability to function in this area." *Id.* Given the definitions on the form, the functional implications of "marked" and "extreme" limitations seem clear. Although the ALJ indicated Dr. Morton did not support his opinion with objective findings, the undersigned notes that Dr. Morton observed Plaintiff to be depressed, to cry throughout

the evaluation, to demonstrate an unstable affect, to be experiencing severe symptoms of depression and mild symptoms of psychosis, to be paranoid, and to have poor control of her emotions. Tr. at 722, 724. The ALJ's finding that Dr. Morton did not consider Plaintiff's level of mental functioning prior to the time of his evaluation conflicts with Dr. Morton's indications that he reviewed the records that SSA provided to him[8] and obtained Plaintiff's history. *See* Tr. at 722–24. As for the ALJ's indication that Dr. Morton's impressions may have been colored by Plaintiff's lack of mental health treatment,[9] the undersigned notes that Dr. Morton was aware of Plaintiff's treatment history and the fact that she was not taking medications and did not indicate that her mental functioning was likely to improve with treatment or medications. *See* Tr. at 722.

In rejecting parts of Dr. Morton's opinion, the ALJ ignored the opinions and observations of the treating physicians and the other examining psychologist whose observations were consistent with those of Dr. Morton. *See* Tr. at 210, 217, 233–36, 268, 270, 272, 316, 318, 327–28, 338–39, 340–46. Both Dr. Morton and Dr. Ruffing evaluated

---

[8] The ALJ indicated Dr. Morton only reviewed the May 2009 treatment note from Dr. Esquivel, but Dr. Morton indicated the following: "The disability office provided records which included a medical note from Heather Esquivel M.D. from May of 2009." *See* Tr. at 439, 722. Had Dr. Morton indicated that SSA provided only a note from Dr. Esquivel, it would have been reasonable for the ALJ to find that he had considered no other records. However, because the ALJ cited Dr. Esquivel's record as being among the records SSA provided to him for review, the ALJ's conclusion appears unsupported. It is possible that Dr. Morton cited Dr. Esquivel's treatment note because it was the most recent in the record from a treating physician or from any physician who commented on Plaintiff's mental status. *See* Tr. at 698–700.

[9] Plaintiff argues that the ALJ did not adequately consider her financial bars to obtaining medical treatment, and the Commissioner maintains that the ALJ cited sufficient reasons to support his conclusion that Plaintiff chose not to obtain medical treatment. *See* ECF Nos. 13 at 32–33, 15 at 19–20. The undersigned declines to resolve this issue as it is not necessary to the evaluation of the ALJ's consideration of Dr. Morton's opinion.

Plaintiff's mental status at the direction of the SSA and both made very similar findings and reached comparable conclusions regarding Plaintiff's functional abilities. *Compare* Tr. at 233–36, 340–46, *with* Tr. at 719–21, 722–25. Furthermore, every examining provider who commented on Plaintiff's mental functioning suggested work-preclusive limitations. *See* Tr. at 235, 337, 338–39, 719–21. Although the ALJ cited perceived inconsistencies between Dr. Morton's observations and those of Dr. Tomarchio, it is important to note that Dr. Tomarchio conducted a physical examination and, aside from indicating that Plaintiff had no suicidal or homicidal ideations or audio-visual hallucinations, provided no comment on Plaintiff's mental status or emotional stability. *See* Tr. at 715–18. In light of this evidence, the undersigned recommends the court find the ALJ did not adequately support his decision to reject portions of Dr. Morton's opinion.

### 2. Dr. Jonas' Opinion

During the hearing, Plaintiff's attorney objected to Dr. Jonas's testimony and questioned the SSA's compliance with the SSA's Hearings, Appeals, and Litigation Law Manual ("HALLEX") in selecting him as the ME in two consecutive hearings. Tr. at 524–25. The ALJ explained that it was the SSA's practice to call on one ME to testify for the entire day. Tr. at 527. Plaintiff's attorney indicated he understood the practice, but argued it was not in strict compliance with HALLEX. *Id.* He stated that he understood the need for expediency, but indicated "in this particular case with this particular medical expert" he believed "the rules specified in HALLEX should apply and be applied stringently." Tr. at 527–28. The following exchange then took place:

ATTY:        Well, we are, your honor, but I'm offering the alternative. The other alternative is that – – I'm assuming and I think I'm on the right track, that Dr. Jonas has been called specifically to discredit the report of Dr. Norton [sic].

ALJ:         I don't know what he is.

ATTY:        Judge, please don't insult my intelligence. I know why this has been done.

ALJ:         First, of all – –

ATTY:        I'm not a fool.

ALJ:         You don't have to interrupt me in the middle of my statement.

ATTY:        Fair enough.

ALJ:         He is being called to clarify the inconsistencies in the record.

ATTY:        I can tell you what Dr. Jonas is going to say almost verbatim as he's testified in every other case.

ALJ:         I don't know that he's going to testify to.

ATTY:        No, I can predict it, judge. I don't need a crystal ball.

ALJ:         Okay.

Tr. at 528–29. Despite Plaintiff's objection to Dr. Jonas' testimony, the ALJ proceeded to call him as a witness. Tr. at 530. Plaintiff's attorney subsequently objected to Dr. Jonas's testimony based on inaccuracies in his CV, but the ALJ overruled that objection, as well. *See* Tr. at 534–41.

Plaintiff argues the ALJ failed to follow the SSA's operating procedure in selecting Dr. Jonas as the ME and erroneously disregarded her objection to Dr. Jonas's testimony. [ECF No. 13 at 35.] Plaintiff points out that this court recently recognized

problems related to Dr. Jonas's testimony as a "hired gun" of the SSA in *Creekmore v. Colvin*, No. 5:14-3019-RMG, 2015 WL 4771947, at *7 (D.S.C. Aug. 12, 2015), and that the court's recent ruling suggests she was prejudiced by the ALJ's failure to sustain her objection. *Id.* at 36–37.

The Commissioner argues the ALJ reasonably explained his reasons for obtaining testimony from Dr. Jonas and that Plaintiff cannot show that she was prejudiced by the ALJ's reliance on Dr. Jonas's testimony. [ECF No. 15 at 20–21].

HALLEX specifies the following procedure for selecting MEs:

Each RO[10] maintains a roster of MEs who have agreed to provide impartial expert opinion pursuant to a BPA[11] with the Office of Hearings and Appeals (OHA). (See I-2-5-31, Blanket Purchase Agreements.) An ALJ must select an ME who is maintained on any RO's roster to the extent possible. The ALJ or designee must select an ME from the roster in rotation to the extent possible; i.e., when an ALJ selects an ME with a particular medical specialty from the roster to provide expert opinion in a case, that ME will go to the bottom of the roster and will not be called again by that ALJ or any other ALJ in the HO[12] until all other MEs on the roster with that medical specialty are called. If an ME in the specialty needed by the ALJ is not available on the RO roster of the HO's region, then the ALJ should look to other RO rosters to obtain the services of an ME.

HALLEX I-2-5-36 (S.S.A.), 1994 WL 637371, at *1.

In his decision, the ALJ acknowledged Plaintiff's objection to Dr. Jonas's testimony, but found that the errors in Dr. Jonas's CV did not prevent the admissibility of his testimony or "significantly erode the weight Dr. Jonas' testimony deserves." Tr. at 440. He indicated that he had "made documents part of the record addressing the

---

[10] Regional Office
[11] Blanket Purchase Agreement
[12] Hearing Office

representative's concerns" regarding the selection of Dr. Jonas as the ME. *Id.* He included internal correspondence regarding the scheduling of the ME from the SSA's Greenville Office of Disability Adjudication and Review ("ODAR"). Tr. at 659–61. The correspondence indicates that the hearing was scheduled with the attorney's scheduler on April 16, 2014, and that a ME was "advised (not yet confirmed)." Tr. at 659. On May 5, 2014, Bernice V. Shearer ("Ms. Shearer") sent an email to Valentina Flores-Mitchem ("Ms. Flores-Mitchem") and Brandy Tillis inquiring as to the identity of the next "psych ME" on the rotating list. *Id.* Ms. Flores-Mitchem questioned whether Ms. Shearer was seeking a psychologist or a psychiatrist. *Id.* Ms. Shearer responded that she was seeking a psychologist. *Id.* Ms. Flores-Mitchem replied that the next psychologist on the list was Dr. George W. Rogers ("Dr. Rogers"), followed by Dixie Moore, Ph. D. ("Dr. Moore"). Tr. at 659–60. A note indicates the following: "e-mail communication stops between the calendar coordinator & scheduler because scheduler is given a copy the list of Region IV listing with Psychiatry & Psychology.[13] Scheduler continues w/search for ME requested due to TYPE & AVAILABILITY." Tr. at 660. The internal correspondence indicates a notice of hearing was created on June 6, 2014, and that Plaintiff, her attorney, the VE, and the ME were notified, but it contains no clarification as to how Dr. Jonas was selected as the ME. *Id.* Statements from Rhonda Bolding ("Ms. Bolding") and Nancy

---

[13] The list includes 12 MEs, but fails to differentiate between psychiatrists and psychologists. *See* Tr. at 660. Three of the MEs, including Dr. Jonas, have unexplained double asterisks beside their names. The undersigned has considered whether the double asterisk may distinguish the psychiatrists from the psychologists, but has dismissed this notion because Dr. Moore, who was identified in the correspondence as a psychologist, has double asterisks beside her name. *See id.*

Shockley ("Ms. Shockley"), employees of the Greenville ODAR, suggest that Dr. Jonas was selected based on his specialty and availability and that it was their procedure to schedule the same ME for all cases scheduled on the same day that required that ME's specialty. Tr. at 690, 694.

The ALJ cited Dr. Jonas's testimony in support of his decision to refute portions of the opinions of Drs. Ruffing and Morton. Tr. at 441–43. He relied on Dr. Jonas's testimony that Dr. Morton's findings and statements were inconsistent with the record as a whole and with his finding that Plaintiff could manage benefits in her own best interest and could recall three words after a 10-minute delay. Tr. at 441–42. He found that "Dr. Jonas' testimony supports that Dr. Morton's opinion deserves less than significant weight, because some of Dr. Morton's opinions and statements are inconsistent with the record." Tr. at 443. The ALJ also discussed Dr. Jonas's opinion that Dr. Ruffing made inconsistent findings in determining that Plaintiff was both capable of managing her own finances and had considerable impairment with social interaction, concentration, and pace. Tr. at 442.

The ALJ gave "great, but not significant, weight to portions of Dr. Jonas' testimony," and indicated that he assessed greater restrictions as part of the RFC assessment than those Dr. Jonas suggested were necessary. Tr. at 440. He indicated Dr. Jonas's testimony deserved great weight because of his specialty as a psychiatrist and the fact that he had more than 30 years of experience as a practicing psychiatrist and continued to practice psychiatry. *Id.* He acknowledged that Dr. Jonas had no examining or treatment relationship with Plaintiff, but indicated Dr. Jonas had reviewed the entire

record and was "an expert in the evaluation, diagnosis, and treatment of mental conditions." *Id.* He found that "in many respects" Dr. Jonas's testimony was "consistent with the record as a whole." *Id.*

The undersigned's review of the procedure the SSA engaged in to obtain Dr. Jonas's testimony reveals a failure to comply with the provisions of HALLEX I-2-5-36, which states that "[t]he ALJ or designee must select an ME from the roster in rotation to the extent possible." The internal correspondence reveals that Dr. Jonas was not among the next two MEs identified in the rotation. *See* Tr. at 659–60. It provides no explanation as to why Dr. Jonas, a psychiatrist, was selected as the ME when Ms. Shearer initially requested the testimony of a psychologist. *See* Tr. at 659. Furthermore, the statements from Ms. Bolding and Ms. Shockley admit that it was office procedure to schedule all cases before the same ME on the same day. *See* Tr. at 690, 694. While this might have been office procedure, the office procedure failed to comply with the directives of HALLEX I-2-5-36, which requires that, once an ME renders an opinion in "a case," the ME rotates to the bottom of the roster.

In *Way v. Astrue*, 789 F.Supp. 2d 652, at *665 (D.S.C. 2011), the court acknowledged that a failure to follow the procedures set forth in HALLEX did not require automatic reversal or remand. However, the court looked to the Fifth Circuit's decision in *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000), which held that reversible error exists where the agency's failure to follow its own procedures causes prejudice to an individual. *Way*, 789 F.Supp. 2d at 665. The court held that when the Commissioner fails to follow HALLEX, it is necessary for the court to determine whether the claimant

was prejudiced. *Id.* Because the undersigned has recommended a finding that the ALJ did not comply with the provisions set forth in HALLEX, it is necessary to consider whether Plaintiff was prejudiced by the ALJ's failure to comply with the agency's procedures.

In light of this court's recent decision in *Creekmore v. Colvin*, No. 5:14-3019-RMG, 2015 WL 4771947, at *5–7 (D.S.C. Aug. 12, 2015), Plaintiff's reasons for objecting to Dr. Jonas's testimony appear to be valid. Dr. Jonas provided very similar testimony in *Creekmore*, which the court summarized as follows:

> Dr. Jonas testified that he was a psychiatrist in private practice in Miami, Florida. Dr. Jonas attacked the treatment and opinions of Plaintiff's primary treating psychiatrist, Dr. Khan, claiming that there was "no support" for the longstanding diagnosis of bipolar disorder. Tr. 909, 919. He also claimed that Dr. Khan's opinions were "internally inconsistent" because he claimed the patient had severe impairments but opined the patient could handle her own finances. Tr. 910–12.

*Creekmore*, 2015 WL 4771947, at *5. The court concluded that the ALJ improperly gave controlling weight to Dr. Jonas's opinion and indicated that because he was a non-treating, non-examining physician, his opinion was among "the lowest regarded class of opinions offered in a Social Security disability hearing under the Treating Physician Rule." *Id.* at *6. The court then pointed out it was "not the first to raise questions regarding an ALJ's improper weighing of the expert opinions of Dr. Jonas' after he [was] called into a hearing to challenge the opinions of a claimant's treating physicians." The court explained as follows:

> In *Smith v. Astrue*, C.A. No. 09-cv-4999, 2011 WL 12533233, at *9 (E.D.N.Y. 2011), Judge John Gleeson reversed the denial of disability benefits and remanded the case to the agency because of the "improper weight" given the opinions of Dr. Jonas. Similarly, Judge Sandra Townes reversed a decision of the Commissioner denying disability in *Roman v.*

> *Astrue*, C.A. No. 10-cv-3085, 2012 WL 4566128 at *10, 14–15, 19 (E.D.N.Y. 2012), because of "improper application of the Treating Physician Rule" in the weighing of the opinions of Dr. Jonas, who [was] again simply called into the hearing as a chart reviewer. This same conclusion was reached on a referred Social Security disability case to Magistrate Judge Michael Putnam in *Tobler v. Colvin*, C.A. No. 2:13-1095, 2014 WL 4187372 at *3–4 (N.D.Ala. 2014), who found that "an incorrect legal standard" was used in weighing the opinions of Dr. Jonas and the claimant's treating physicians.

*Id.* at *7. The court stated "[i]n the course of reviewing the case law regarding Dr. Jonas' testimony," it "came across what appeared to be a troubling pattern of the Social Security Administration repeatedly utilizing Dr. Jonas to attack the opinions and treatment of claimants' treating physicians." *Id.* It further explained that "[m]any of these cases where Dr. Jonas testified against the claimant involved, like this matter, a reversal of an earlier denial of Social Security disability by a district court and remand to the agency for a new administrative hearing." *Id.* The court then admonished the Commissioner that it "would look with grave concern on the use by the Social Security Administration of a 'hired gun' expert to defeat the claims of potentially deserving claimants by systematically attacking the positions and treatment of their treating physicians." *Id.*

While this case differs from *Creekmore* and the other cases cited by the court in *Creekmore* in that Dr. Jonas's testimony was used to refute examining physicians' opinions as opposed to treating physicians' opinions, the similarities between those cases and the instant one far outweigh that singular difference. This case, like *Creekmore*, was before the ALJ on remand from the court. *See* Tr. at Tr. at 592–93, 594–610. Dr. Jonas testified in both cases that the diagnoses of record were unsupported. *Creekmore*, 2015 WL 4771947, at *5, *with* Tr. at 547–48. As in *Creekmore*, the ALJ relied upon Dr.

Jonas's testimony that an ability to handle one's own funds is inconsistent with a finding of disability to refute the opinions of other medical sources. *Compare Creekmore*, 2015 WL 4771947, at *5, *with* Tr. at 441–43. Similarly, the ALJ here, like the ALJs in *Creekmore* and the other cases cited in *Creekmore*, relied upon Dr. Jonas's opinion to refute the opinions of providers whose opinions presumptively carried more weight under the provisions of 20 C.F.R. §§ 404.1527(c) and 416.927(c). *Compare Creekmore*, 2015 WL 4771947, at *5–7, *with* Tr. at 441–43.

Although the record does not prove that the ALJ specifically selected Dr. Jonas as the ME to refute the medical opinions of record, the deviation from the procedure specified in HALLEX I-2-5-36 provides some support for Plaintiff's allegation. The undersigned further notes that the court's 2012 order did not require the ALJ to obtain the services of a ME. *See* Tr. at 606–08, 610. In fact, it appears that the ALJ only sought the testimony of a ME after the second hearing and after obtaining the report from Dr. Morton that suggested Plaintiff had work-preclusive limitations of function. *See* Tr. at 457–514 (November 21, 2013, Hr'g Tr.), 659 (April 16, 2014, note indicating that hearing was scheduled and that ME was advised, but not yet confirmed), 722-25 (Dr. Morton's report from consultative examination conducted on January 28, 2014). In light of this court's concern over the propriety of Dr. Jonas's testimony and the ALJ's reliance on that testimony, the undersigned recommends a finding that Plaintiff was prejudiced by the ALJ's failure to comply with the provisions of HALLEX I-2-5-36. Because the ALJ erred in selecting Dr. Jonas as the ME and in relying on his testimony to refute the testimony of the examining physicians, the undersigned recommends the court find that

substantial evidence did not support the ALJ's evaluation of the medical opinion evidence.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

January 25, 2016                                    Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

60

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).